**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

<table>
<tr><td>

FUEL OX, LLC,

    Plaintiff,

       v.

HAROLD DAMRON, et al.,

    Defendants.

</td><td>

Civil Action No. 25-14102 (RK) (JBD)

**OPINION**

</td></tr>
</table>

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the Motions to Dismiss by Duravi, Inc. ("Duravi, Inc."), Harold Damron ("Damron"), and HD Innovations, LLC ("HDI") (collectively, "Defendants"). (ECF Nos. 23, 27.) Duravi, Inc. brought its Motion under Federal Rule of Civil Procedure ("Rule") 12(b)(2), asserting that this Court lacked personal jurisdiction over it. (*See generally* "Duravi MTD," ECF No. 23-1.) Damron and HDI (the "Damron Defendants") brought their Motion under Rule 12(b)(6), arguing that Plaintiff Fuel Ox, LLC ("Plaintiff") had failed to assert a cognizable claim against them. (*See generally* "Damron MTD," ECF No. 27-1.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, Duravi, Inc.'s Motion is **GRANTED** and the Damron Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

### A.    PLAINTIFF CONTRACTS WITH THE DAMRON DEFENDANTS

Plaintiff, a limited liability company organized under the laws of and based in New Jersey,

alleges that Defendants breached, undermined, and ignored Plaintiff's exclusive rights to market and sell "a proprietary, bio-based lubricant formulation known as HDI-2500 or Liquid Friction Eliminator ('LFE')."[1] ("AC," ECF No. 13 ¶¶ 1, 4, 9.) Founded in 2013, Plaintiff "develops advanced fuel additives aimed at improving engine performance, reducing emissions, and promoting environmental sustainability." (*Id.* ¶ 17.) Among other things, Plaintiff sells "high-performance lubricants" approved by the United States Department of Agriculture ("USDA") across a number of global markets and industries, including for "military use, . . . transportation, construction, marine, and mining." (*Id.* ¶¶ 18–20.)

In early 2021, Damron contacted Alec Taylor, Plaintiff's co-founder and Chief Operating Officer, "to express his appreciation for Plaintiff's products and to propose the inclusion of his bio-based/plant-based lubricant, LFE, in Plaintiff's product portfolio." (*Id.* ¶ 21.) Alec Taylor visited Damron in Ohio, his (and his company Defendant HD Innovations, LLC's) home state, and was impressed with Damron's LFE products. (*Id.* ¶¶ 22–23.) Following Alec's recommendation, Randall Taylor, Plaintiff's other co-founder and CEO, also visited Ohio for a demonstration of Damron's lubricants and tour of Damron's facility. (*Id.* ¶¶ 23–24.)

"[R]ecognizing the quality of [the Damron Defendants'] product(s)," Plaintiff entered into "an exclusive business relationship with Damron and HD Innovations, LLC" on April 7, 2021. (*Id.* ¶¶ 25–26.) As will be described in the following Section, this business relationship would not last because of the alleged meddling of the final named Defendant, Duravi, Inc. Damron and Randall Taylor executed a 3-page, written agreement (the "Agreement") memorializing the business relationship for an initial ten-year term set to automatically renew for a second ten years thereafter.

---

[1] The Amended Complaint and parties' briefing use LFE and HDI-2500 interchangeably to describe Damron's lubrication product at issue. (*See* Damron MTD at 8 n.2.)

2

(*Id.* ¶ 26; *id.* at 35[2] ("At the end of the initial term the agreement will be automatically renewed for an additional 10 years (the 2nd Term). There will be Five (5), Ten-year renewal terms.").) Although the Agreement specified that the Damron Defendants "owned and will continue to [own]" the HDI-2500 formula, it gave Plaintiff "the exclusive right to market and sell HDI-2500 and any derivative of, or ancillary products or HDI-2500" for the contractual term. (*Id.* at 35.) The Agreement also required that "[t]he original, (and most premium of formulations created by Mr. Damron), formula of HDI-2500 shall be provided exclusively to [Plaintiff] and to no other entity" at a price of "$3500 per drum" of lubricant, subject to future changes. (*Id.*) In addition to purchasing drums of LFE, Plaintiff agreed to pay Damron a salary of $100,000, a 25% commission on gross sales of LFE Damron initiated to existing prospective clients, a 15% commission on gross sales Damron initiated to new prospective clients, and an 8% commission on any other sales with which Damron assisted. (*Id.* at 36.) The parties also agreed to share, fifty-fifty, future profits related to any *existing* agreements Damron had already entered into "involving the sale of HDI-2500," as well as sharing the proceeds of any *future* sales of the HDI-2500 formula to prospective buyers, so long as that decision to sell was "unanimous between Harold [Damron] and Randall [Taylor]." (*Id.* at 37.) The Court notes, somewhat surprisingly, that the subject Agreement—shorter than 3 pages in length, without numbered paragraphs, and with headings such as "Important Points" and "Other Important Points"—does not appear to have been reviewed or prepared by legal counsel. (*See id.* at 35–37.)

In addition to the various compensatory and LFE-usage terms discussed hereinabove, Damron himself agreed to join Plaintiff's "Infinity Lube Division" as the "Director of

---

[2] The Agreement is appended to Plaintiff's AC as "Exhibit A" as part of the same CM-ECF entry as the AC itself. (*See* AC at 35–37.) Thus, because the Agreement itself does not contain page numbers, the Court refers to the Agreement (and other exhibits to the AC) by PDF page number.

Lubrication," where he would "work on creating new and exciting products that will utilize the HDI-2500 technology." (*Id.* ¶ 28; *id.* at 35–36.) As the "face of the Infinity Lubes division," Damron agreed to work with and train Plaintiff's sales team in the marketing and sale of HDI-2500 products, as well as "attend functions, trade shows, symposiums, and the like" to help promote LFE.[3] (*Id.* at 36.)

Plaintiff alleges that it undertook extensive efforts to perform its obligations under the Agreement and "enhance the marketability of LFE-based products." (*Id.* ¶ 30.) Plaintiff hired a government relations attorney and spent $75,000 "to obtain USDA BioPreferred and National Sanitation Foundation (NSF) H-1 food-grade safety certifications for LFE," that "significantly" improved its marketability "in food-processing environments." (*Id.* ¶¶ 31–34; *id.* at 41–52.) Using Damron's LFE concentrate, Plaintiff developed and launched new "Super Grease and Super Spray" products. (*Id.* ¶ 35.) As part of its marketing and promotion efforts, Plaintiff trademarked its product "Fuel Ox Infinity Lube," (*id.* ¶ 29; *id.* at 39), and estimates that its representatives "attended approximately 60 trade shows across the United States to promote LFE-based products" and that it attended "hundreds of meetings with prospective customers" from April 2021 to September 2024, (*id.* ¶¶ 38–39). Over the same period, Plaintiff paid Damron more than $550,000 in salary, commission, and travel reimbursements, (*id.* ¶ 30), and—"[a]t Damron's urging"—hired Shawn Johns as an LFE expert, who Plaintiff alleges "ultimately contributed no measurable value and, upon information and belief, joined Damron's new venture with [Defendant] Duravi, Inc.,"

---

[3] The AC also specifies that, under the Agreement, "Plaintiff committed to promoting LFE at industry events and pursuing regulatory certifications." (AC ¶ 27.) However, the Agreement—as attached to Plaintiff's AC—does not appear to include such obligations on Plaintiff, instead only requiring *Defendant* HDI to "always maintain, in good standing, the Intellectual Properties of the HDI 2500 (Concentrate)." (*Id.* at 35.) To the extent Plaintiff's allegations regarding the terms of the Agreement conflict with its plain text, the Court need not accept Plaintiff's characterization as true. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.").

4

(*id.* ¶ 36).

## B.    DAMRON DEALS WITH DURAVI, INC.

In contrast to Plaintiff's efforts to perform under the Agreement and promote LFE products, Plaintiff alleges that Defendant "began private negotiations [in mid-2023] with [Defendant] Duravi, Inc. representatives while continuing to receive full compensation from Plaintiff and representing ongoing allegiance to Plaintiff." (*Id.* ¶ 42.) Plaintiff alleges that "in or around January 2024, Damron received $750,000 for transferring his lubricant formula, LFE, to Duravi" without Plaintiff's consent. (*Id.* ¶¶ 44–45.) In June 2024, Duravi, Inc.—with its principal place of business in Texas[4]—incorporated in Delaware, which Plaintiff alleges was done "for the improper and exclusive purpose of marketing and selling the LFE product line."[5] (*Id.* ¶¶ 41, 43.)

Around this time in mid-2024, Plaintiff alleges that Damron stopped performing his obligations under the Agreement. (*Id.* ¶ 46.) After having only attended six or seven trade shows since 2021, Damron stopped attending the shows entirely, "ceased engaging in promotional activity, and withheld updates on his development [from Plaintiff]." (*Id.* ¶¶ 40, 46.) On July 20, 2024, after Plaintiff notified Damron that "continued payment of his $100,000 salary was unsustainable without support," Damron allegedly stated that he "was waiting for [Plaintiff] to cut [him] off." (*Id.* ¶ 47.)

In a subsequent phone call with Randall Taylor, Damron revealed his dealings with Duravi, Inc. for the first time, "misrepresenting them as aligned with his partnership with Plaintiff." (*Id.* ¶

---

[4] The AC alleges that Duravi Inc.'s principal place of business is in Colorado "and/or" Texas. (AC ¶ 7.) Duravi, Inc. asserts in its Motion brief that its principal place of business is in Texas, a point to which Plaintiff does not respond in opposition. (Duravi MTD at 6.) Given Plaintiff's lack of opposition—and because the Court's analysis of the various personal jurisdictional issues in this Opinion are unaffected by Duravi, Inc.'s presence in either Texas or Colorado—the Court presumes that Duravi, Inc. is based in Texas.

[5] In support of this allegation, Plaintiff points to Duravi, Inc.'s website, where, in the "Our Story" section, Duravi, Inc. attributes its existence to the "curiosity of our inventor, Howard Damron," whose "discoveries laid the foundation for what would become Duravi." (AC ¶ 43; *id.* at 58.)

5

48.) Damron, "express[ing] enthusiasm" about Duravi, Inc.'s assorted business opportunities and connections, offered Plaintiff's CEO Randall Taylor "a vague, undocumented stake in Duravi." (*Id.* ¶¶ 49–50.) Taylor asked Damron to "send him the paperwork" regarding such a proposal, which Damron never did. (*Id.* ¶¶ 50–51.) Plaintiff then attempted to purchase LFE from Damron and Duravi, Inc., "but those purchase orders were ignored." (*Id.* ¶ 52.) In September 2024, Damron and Randall Taylor spoke again, where Damron "formally announced his inability to supply Plaintiff with LFE-based products, attributing this decision to Duravi, Inc.'s acquisition of the formula, as directed by Duravi's officers." (*Id.* ¶ 53.) On September 9, 2024, Duravi, Inc. named Damron its "Chief Scientist" in a press release. (*Id.* ¶ 54.) Plaintiff alleges that Damron has continued to provide no information regarding this purported "stake" in Duravi, Inc., "ignored communications, and denied knowing Plaintiff's Co-Founder and COO, Alec Taylor, in a final call in May 2025." (*Id.* ¶ 55.)

## C.   PROCEDURAL HISTORY

On August 4, 2025, Plaintiff filed its initial complaint against the Damron Defendants only. (ECF No. 1.) Plaintiff asserted breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and other related claims against the Damron Defendants. (*See generally id.*) On October 17, 2025, with this action still pending, Plaintiff's counsel mailed a cease-and-desist letter to Duravi, Inc.'s CEO, Thomas Denning, demanding that Duravi, Inc. cease and desist "any further marketing, distribution, sale, or promotion of HDI-2500 or any related derivative or ancillary products." (ECF No. 24 at 38–39; AC ¶ 56.[6]) On October 31, 2025, with consent from the Damron Defendants, Plaintiff amended its complaint to include additional claims against the Damron

---

[6] The AC states that the date of this cease-and-desist was October 8, 2025, (AC ¶ 56), but the actual letter— as attached to the Taylor Declaration—lists October 17, 2025, (Duravi Opp. at 38). The Court will rely on the plain language of the document and presume that this letter was sent on October 17. *See ALA, Inc.*, 29 F.3d at 859 n.8.

6

Defendants as well as including Duravi, Inc. as a new defendant. (ECF No. 12; *see generally* AC.) Against the Damron Defendants, Plaintiff now asserts claims for (1) breach of fiduciary duty (against only Damron himself), (2) breach of contract, (3) breach of implied covenant of good faith and fair dealing, (4) unjust enrichment, (5) fraudulent misrepresentation, (6) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and (7) misappropriation of trade secrets under the New Jersey Trade Secrets Act ("NJTSA"), N.J. Stat. Ann. § 56:15-1 *et seq.* (*Id.* ¶¶ 58–109.) Against Duravi, Inc., Plaintiff asserts claims for (1) tortious interference of contract, (2) tortious interference of economic advantage, (3) unjust enrichment, (4) misappropriation of trade secrets under the DTSA and NJTSA, and (5) aiding and abetting Damron's breach of fiduciary duty. (*Id.* ¶¶ 110–65.) Plaintiff also asserts a civil conspiracy claim against all Defendants. (*Id.* ¶¶ 166–76.)

Following correspondence from the parties, (ECF Nos. 14–15, 17–18), the Court ordered a briefing schedule for Defendants' instant Motions to Dismiss in December 2025, (ECF No. 19), which the Court extended at Plaintiffs' request, (ECF No. 21). Consistent with the extended schedule, Duravi, Inc. filed its Motion pursuant to Rule 12(b)(2), (Duravi MTD), and the Damron Defendants filed their Motion pursuant to Rule 12(b)(6), (Damron MTD). Plaintiff opposed both Motions, including a Declaration from its CEO Randall Taylor with its opposition to Duravi, Inc.'s Motion.[7] ("Duravi Opp.," ECF No. 24; "Taylor Decl.," ECF No. 24 at 26–32; "Damron Opp.,"

---

[7] As discussed below, Plaintiff attaches the Taylor Declaration to its opposition to Duravi Inc.'s Rule 12(b)(2) Motion to Dismiss as part of its obligation to support assertions of personal jurisdiction on "actual proofs, not mere allegations." (ECF No. 24 at 26–32); *Patterson ex rel. Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)); *Real Estate Sols. Today LLC v. Scifo*, No. 20-4512, 2021 WL 486896, at *1 n.2 (D.N.J. Feb. 10, 2021) ("On a motion to dismiss for lack of personal jurisdiction, the parties may rely on the complaint, affidavits, or other competent evidence."). The Court only relies on the Taylor Declaration insofar as it pertains to Plaintiff's assertion of jurisdiction. The Court otherwise limits its assessment of the Motions to the AC and its attached documents. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.

ECF No. 28.) Each set of Defendants replied. ("Duravi Reply," ECF No. 25; "Damron Reply," ECF No. 29.) The Motions are now ripe for decision.

## II.    LEGAL STANDARD

### A.    RULE 12(B)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(2) permits a party to move to dismiss a case for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). On a motion to dismiss, the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Once a defendant raises a jurisdictional defense, the "plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). Such competent evidence may include sworn affidavits, *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984), but may not include a mere "unverified complaint," *Markferding v. Westmoreland Cnty. (Pa.) Domestic Rels. Off.*, No. 05-755, 2005 WL 1683744, at *3 (D.N.J. June 17, 2005), or bare assertions made "upon information and belief." *Victory Int'l (USA) Inc. v. Perry Ellis Int'l, Inc.*, No. 07-375, 2008 WL 65177, at *6 (D.N.J. Jan. 2, 2008) (citing *Mass. Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)). In short, the plaintiff must offer "actual proofs, not mere allegations." *Patterson by Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990) (quoting *Time Share Vacation Club*, 735 F.2d at 67 n. 9). The Court must construe all disputed facts in the plaintiff's favor. *See Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

To meet its burden of establishing personal jurisdiction, a plaintiff may show the

---

1997) (holding that a court may consider documents "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss (cleaned up)).

defendant's "continuous and systematic" contacts with the forum state such that the Court can exercise general jurisdiction over the plaintiff. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945). Alternatively, the plaintiff may allege that a defendant has sufficient minimum contacts with a state to create specific jurisdiction, accomplished by "establish[ing] with reasonable particularity" three elements.[8] *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129–30 (3d Cir. 2020) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). First, the defendant must have "'purposefully directed [its] activities' at the forum." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Second, the plaintiff's claims must "arise out of or relate to" the defendant's contacts with the forum. Id. (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Third, the exercise of personal jurisdiction must not "offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

## B.    RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

For a complaint to survive dismissal under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[8] Furthermore, in order to exercise "long-arm" jurisdiction over a defendant, the Court must first "apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction; then, the court must apply the precepts of the Due Process Clause of the Constitution. In New Jersey, this inquiry is collapsed into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998); N.J. Ct. R. 4:4-4(b)(1); *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 283 (3d Cir. 1981) (explaining that this two-part inquiry is also applicable in non-diversity cases).

9

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The court accepts all allegations in the complaint as true and gives the plaintiff "the benefit of every favorable inference to be drawn therefrom." *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, a court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up).

## III.    DISCUSSION

### A.    PERSONAL JURISDICTION OVER DURAVI, INC.

In its Rule 12(b)(2) Motion, Duravi, Inc. argues that the Court lacks personal jurisdiction over it. (*See generally* Duravi MTD.) Plaintiff does not argue that the Court can exercise general personal jurisdiction over Duravi, Inc., a Texas-based corporation incorporated in Delaware, (Duravi Opp. at 13; Duravi MTD at 6), and does not even attempt to argue that Duravi, Inc. satisfies "the traditional specific-personal-jurisdiction test, which focuses on whether [Duravi, Inc.] had

enough minimum contacts with New Jersey,"[9] *Aquino v. Breede*, No. 24-2941, 2025 WL 2058876, at *2 (3d Cir. July 23, 2025) (citing *Ford Motor v. Mont. Eighth Jud. Dist. Ct.* 592 U.S. 351, 359 (2021)). Instead, Plaintiff relies exclusively on the "effects" test articulated by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789 (1984) as the basis for the Court's jurisdiction over Duravi, Inc. (Duravi Opp. at 13–19.)

As the Third Circuit explained in *IMO Indus., Inc. v. Kiekert AG*, the *Calder* effects test allows a court to "exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum." 155 F.3d 254, 261 (3d Cir. 1998) (citing *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 148 (3d Cir. 1992)). To conclude that the Court has such jurisdiction over the nonresident defendant for intentional "business torts,"[10] a plaintiff must show, by a

---

[9] The Court separately notes that such traditional specific jurisdiction would not reach Duravi. Duravi did not "purposefully avail [] itself of the privilege of conducting activities within" New Jersey, nor does the litigation "arise[] our of or relate[] to the defendant's contacts" with New Jersey. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924–25 (2011). Duravi's direct contacts with New Jersey are namely based on minimal correspondence with Plaintiff's counsel *largely initiated by Plaintiff's counsel* in connection with its request that cease-and-desist *following the start of this litigation.* (Taylor Decl. ¶¶ 14–15); *Aquino v. Breede*, No. 23-2459, 2023 WL 7195173, at *2 n.6 (D.N.J. Nov. 1, 2023); *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259–60 & n.3 (3d Cir. 1998) ("[M]inimal communication between the defendant and the plaintiff in the forum state, without more, will not subject defendant to the jurisdiction of that state's court system."); *see also Ontel Prods. Corp. v. Mindscope Prods.*, 220 F. Supp. 3d 555, 563 (D.N.J. 2016) (finding that attorney-to-attorney communications made after start of litigation insufficient to create personal jurisdiction for defendant).

Because Plaintiff's unjust enrichment claim against Duravi, Inc. is subject to this traditional test—and not the *Calder* effects test reserved for intentional torts—the Court lacks personal jurisdiction over this quasi-contractual claim. *See Stevens v. Welch*, No. 10-3928, 2011 WL 541808, at *4–5 (D.N.J. Feb. 7, 2011). Plaintiff does not even purport to discuss this unjust enrichment claim in its opposition to Duravi, Inc.'s Motion. (*See generally* Duravi Opp.)

[10] Although the Third Circuit in *IMO Industries* did not exhaustively define this category of intentional business torts, other courts have applied its interpretation of the *Calder* effects test to the tort claims Plaintiff alleges against Duravi in the AC. *See IMO Indus., Inc.*, 155 F.3d at 266–68 (tortious interference with contract); *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 360 (D.N.J. 2019) (DTSA, NJTSA, and tortious interference with prospective economic advantage claims); *Kyko Global, Inc. v. Prithvi Info. Sols. Ltd.*, No. 18-1290, 2020 WL 1159439, at *10, *30–31 (W.D. Pa. Mar. 10, 2020) (aiding and abetting breach of fiduciary duty); *Vectra Visual, Inc. v. Hoving*, No. 21-3296, 2021 WL 4520339, at *8 & n.6

11

preponderance of the evidence:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity[.]

*Id.* at 265–66 (footnote omitted). The key inquiry for the last two prongs is "whether the defendant's conduct connects him to the forum in a meaningful way." *A. Neumann & Assocs., LLC v. NRC Realty & Cap. Advisors, LLC*, No. 24-5754, 2024 WL 4894769, at *4 (D.N.J. Nov. 26, 2024) (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). For the third prong, this requires plaintiff to "show that the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant *expressly aimed* its tortious conduct at the forum." *IMO Indus., Inc.*, 155 F.3d at 266 (emphasis added); *see also A. Neumann*, 2024 WL 4894769, at *4 ("Further, to meet the *Calder* test's third prong, it is not sufficient that a plaintiff merely 'establish that defendant knew that plaintiff was located in a particular forum.'" (quoting *Cabot Corp. v. Niotan, Inc.*, No. 08-1691, 2011 WL 4625269, at *14 (E.D. Pa. Sept. 30, 2011))).

The Court begins with the "often fatal" third prong. *Aquino*, 2025 WL 2058876, at *2; *see Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) ("Only if the 'expressly aimed' element of the effects test is met need we consider the other two elements."). Plaintiff argues that Duravi, Inc.—largely through Damron's conduct as its "Chief Scientist"—"consciously and purposefully" aimed its conduct at New Jersey. (Duravi Opp. at 15–19.) Although Duravi, Inc. was not a party

---

(D.N.J. Oct. 4, 2021) (civil conspiracy). Moreover, although personal jurisdiction is typically a claim-specific inquiry, *see, e.g., Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001), Plaintiff—as described below—relies on identical facts in the AC and Taylor Declaration to support its basis for personal jurisdiction with respect to all six intentional tort claims, (*see* Duravi Opp. at 15–19). Accordingly, the Court analyzes Plaintiff's claims collectively. *See Remick*, 238 F.3d at 255 (claim-specific analysis "may not be necessary . . . in every multiple claim case").

12

to the Agreement, Plaintiff relies on its rights under the Agreement as this Court's basis for personal jurisdiction over Duravi, Inc. (*Id.*) As a general matter, Plaintiff points to Damron and Duravi, Inc.'s efforts to undermine Plaintiff's rights under the Agreement, alleging that: (1) "Duravi was fully aware of Plaintiff's exclusive contractual rights" regarding LFE marketing and sale, but proceeded to "consummate its relationship with [the Damron Defendants]" for $750,000 anyway, (*id.* at 16); (2) Damron's offer to Plaintiff for an ownership stake in Duravi, Inc. in "a half-hearted attempt to buy Plaintiff's silence" after Plaintiff objected to Duravi, Inc.'s acquisition of the LFE-based technology, (*id.*); and (3) Duravi, Inc.'s deliberate refusal to sell LFE-based products to Plaintiff, despite Plaintiff's rights under the Agreement, "ensured that Plaintiff's New Jersey-based Infinity Lube Division could not operate," (*id.* at 17).[11]

Even taken as true, Plaintiff's allegations are insufficient to establish that Duravi, Inc. expressly aimed its conduct at New Jersey. Plaintiff's allegations suggest, at most, that Duravi, Inc. "knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct" in New Jersey, but are not indicative of "specific activity indicating that the defendant expressly aimed its tortious conduct" at New Jersey. *IMO Indus, Inc.*, 155 F.3d at 266. Plaintiff alleges no conduct undertaken by Duravi, Inc. that was actually directed at New Jersey—only conduct that harmed and undermined the contractual rights and business future of Plaintiff, *a company based in New Jersey*. These sorts of allegations are insufficient to confer personal jurisdiction. *See Aquino*, 2025 WL 2058876, at *3 ("Indeed, the only connection to New Jersey is that it is

---

[11] Plaintiff also suggests that its counsel's cease-and-desist demand on Duravi (sent after Plaintiff had already brought suit against the Damron Defendants) put Duravi "on explicit notice that its conduct was causing substantial harm to a New Jersey company," which Duravi then chose to ignore. (Duravi Opp. at 18.) The initial Complaint here was filed on or about August 4, 2025, (ECF No. 1), and Plaintiff cease-and-desist demand was communicated on October 17, 2025, (Duravi Opp. at 38); *supra* note 6. As explained hereinabove, this post-litigation basis for personal jurisdiction is insufficient to create jurisdiction over Duravi. *See supra* note 9; *Ontel Prods. Corp. v. Mindscope Prods.*, 220 F. Supp. 3d 555, 563 (D.N.J. 2016).

[plaintiff's] home. But *Calder* requires 'additional facts' to link [defendant] to New Jersey beyond [plaintiff's] residence there."); *Centimark Corp. v. Ribordy*, No. 25-987, 2025 WL 3481478, at *6 (W.D. Pa. Dec. 4, 2025) (holding that defendant corporation's poaching of an employee and interference with exclusive contractual rights of plaintiff—even with knowledge of plaintiff's rights—were insufficient to create effects test personal jurisdiction); *A. Neumann & Assocs.*, 2024 WL 4894769, at *5 ("The effects test prevents a defendant who [did not] expressly aim its conduct at the forum state from being haled into a jurisdiction solely because it intentionally caused harm that was felt in the forum state." (quoting *Aardvark Event Logistics, Inc. v. Bobcar Media LLC*, No. 16-5873, 2017 WL 59059, at *7 (E.D. Pa. Jan. 5, 2017))). Frankly, aside from assertions that Plaintiff is a limited liability company with its principal place of business in New Jersey—done to establish diversity jurisdiction under 28 U.S.C. § 1332(a)(1)—there is only a single passing reference thereafter in the 33-paged, 176-paragraphed AC to New Jersey in any regard. (AC ¶¶ 4, 9, 17.)

Duravi, Inc. and the Damron Defendants' tortious efforts to undermine Plaintiff's contractual rights were directed, if anywhere, at the states where they consummated their contractual relationship—whether that was Texas, Ohio, or elsewhere. (Duravi MTD at 6; AC ¶¶ 5–6.); *cf Aquino*, 2025 WL 2058876, at *3 ("The focal point of that contractual interference was not New Jersey."). To the extent that Plaintiff relies on Damron's reneging on his various obligations under the Agreement—done allegedly at Duravi, Inc.'s behest—to create personal jurisdiction for Duravi, Inc. in New Jersey, such conspiratorial conduct by the Defendants cannot be said to be "expressly aimed" at New Jersey merely by virtue of Plaintiff's residence there.[12]

---

[12] Relatedly, the plain language of the Agreement itself contains no indication that the Agreement was accepted by the parties in New Jersey, contemplated performance only in New Jersey, subject to the laws of New Jersey, contained a forum selection clause specifying New Jersey for suit, or related to New Jersey

14

*Aquino*, 2025 WL 2058876, at *3 ("[The *Calder* effects test] asks whether the state was expressly targeted more than other jurisdictions. So we ask not just whether there were some contacts with New Jersey, but whether New Jersey was the focus of the alleged tortious interference. It was not." (citations omitted)).

Plaintiff does not direct the Court to a single case suggesting that conduct like Duravi Inc's was sufficiently "aimed" at New Jersey to create personal jurisdiction. (*See* Duravi Opp. at 15–19.) By contrast, courts in this Circuit consistently conclude that—in the absence of conduct directed at the forum state—such harm *caused to a plaintiff's contractual interests* is insufficient for personal jurisdiction, even if the defendant "acted with the intent to undermine [the] contract." *IMO Indus., Inc.*, 155 F.3d at 266; *see Stevens v. Welch*, No. 10-3928, 2011 WL 541808, at *6 (D.N.J. Feb. 7, 2011); *Amres Corp. v. Muffoletto*, No. 24-771, 2024 WL 2300768, at *8 (E.D. Pa. May 21, 2024) ("We require more than interference with a Pennsylvania company's contracts to establish personal jurisdiction [in Pennsylvania]."); *Abira Medical Laby's, LLC v. Karim*, No. 20-4317, 2022 WL 44051, at *6 (E.D. Pa. Jan. 5, 2022) (finding no personal jurisdiction over tortious interference claim where interference of contract occurred in different state); *cf Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001) (finding personal jurisdiction over defendants in Pennsylvania where defendants' tortious interference of a contract between Pennsylvania parties was based on faxes sent to the plaintiff in Pennsylvania).

Accordingly, because the Court lacks personal jurisdiction over Duravi, Inc. with respect to each of Plaintiff's claims against it, Duravi, Inc.'s Motion is granted and Counts VIII through

---

in any way *aside from* Plaintiff's residence there. (*See* AC at 35–37.) In fact, the AC repeatedly references cite visits by Plaintiff's co-founders to Defendant Damron at his home in South Point, Ohio, where Defendant gave them demonstrations of the lubricants and provided "a tour of his facility." (*Id.* ¶¶ 22–24.) Even if the contract expressed such context or terms, the Court would still likely lack personal jurisdiction over Duravi with respect to Plaintiff's intentional tort claims against it. *A. Neumann & Assocs.*, 2024 WL 4894769, at *5; *Centimark Corp.*, 2025 WL 3481478, at *6.

XIV are dismissed without prejudice.

### B. CLAIMS AGAINST THE DAMRON DEFENDANTS

In its Rule 12(b)(6) Motion, the Damron Defendants argue that Plaintiff has failed to adequately plead the eight claims against them, or that such claims fail as a matter of law. (*See generally* Damron MTD). The Court analyzes each of Plaintiff's claims against the Damron Defendants in turn.[13]

#### 1.    Count I: Breach of Fiduciary Duty (Damron Only)

Plaintiff alleges that Damron's interactions with Duravi, Inc. breached his fiduciary duties to Plaintiff. (AC ¶¶ 58–61.) Plaintiff asserts that Damron, in connection with the Agreement, agreed to serve as Plaintiff's "Director of Lubrication," and that that position required fiduciary duties of him. (*Id.* ¶¶ 59–60.) In support of these allegations, Plaintiff first argues that the Agreement constituted a "joint venture" under New Jersey law between Plaintiff and Damron, and that joint venturers owe one another fiduciary duties. (*Id.* ¶ 59; Damron Opp. at 24–25.) Second, Plaintiff argues that Damron owed Plaintiff fiduciary duties "by virtue of his role" of Director of Lubrication as a corporate officer for Plaintiff. (Damron Opp. at 26–27.)

"To establish a claim for breach of fiduciary duty, a plaintiff must allege 1) the existence

---

[13] Although the AC does not specify it, the parties do not dispute in their briefing that each of the state common law claims against the Damron Defendants—Counts I, II, III, IV, V, and XIV—are brought pursuant to New Jersey law. Plaintiff has plausibly asserted—and Defendants do not dispute—that this Court has subject matter jurisdiction both for the presence of a federal question under the DTSA, (AC ¶ 15), and under 28 U.S.C. § 1332(a)(1) for diversity jurisdiction, (*id.* ¶¶ 8–13). Accordingly, consistent with the parties' briefing, the Court will apply New Jersey law for all state law claims. *See, e.g., Zysk v. FFE Minerals USA Inc.*, 225 F. Supp. 2d 482, 501 (E.D. Pa. 2001); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). To the extent that New Jersey's choice of law rules would mandate a different state's law be applied, such an argument is forfeited. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316–17 (3d Cir. 2014). The Court notes that while Defendants have not contested subject matter jurisdiction based on diversity, the Court notes that Plaintiff has failed to properly the plead domicile of the members of the various LLC parties, as it must at least attempt in good faith. (AC ¶¶ 9, 11); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 110 (3d Cir. 2015).

of a fiduciary duty or relationship between the parties; 2) breach of that duty; and 3) resulting damages." *In re U.S. Vision Data Breach Litig.*, 732 F. Supp. 3d 369, 376 (D.N.J. 2024) (quotation marks omitted). In their Motion, the Damron Defendants do not contest that Plaintiff adequately pleaded the final two elements (breach and damages). (Damron MTD at 22–24.) They only argue that Damron did not owe Plaintiff fiduciary duties. (*Id.*) The Court thus focuses its analysis on this first element.

Plaintiff has sufficiently pled that Damron owed such duties by virtue of his role as director.[14] The mere existence of the Agreement is insufficient to impose fiduciary duties on Damron. *CBD & Sons, Ltd. v. Setteducati*, No. 18-4276, 2019 WL 396982, at \*15 (D.N.J. Jan. 31, 2019) ("[A] tort remedy [for breach of fiduciary duty] cannot 'arise from a contractual relationship unless the breaching party owes an independent duty imposed by law.'" (quoting *Saltiel v. GSI Consultants*, 788 A.2d 268, 280 (N.J. 2002))). However, because the Agreement made Damron the "Director of Lubrication" in charge of Plaintiff's "Infinity Lube Division," (AC ¶ 28; *id.* at 35–36), he owed Plaintiff fiduciary duties, *see, e.g.*, *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 230 n.14 (3d Cir. 2003) ("[D]irectors and officers are fiduciaries of the corporations they serve."); *Hill Dredging Corp. v. Risley*, 114 A.2d 697, 712 (N.J. 1955) ("The directors of a private corporation bear a fiduciary relationship to the corporation and to its stockholders."); *Wash v. Finch*, No. 22-1367, 2022 WL 22852415, at \*6 (D.N.J. Dec. 27, 2022) ("Indeed, a director of a limited liability company owes a fiduciary duty to the other members.").

The Damron Defendants' argument in Reply that, in reality, Damron was just "an

---

[14] The Court declines to address Plaintiff's other basis for finding that Damron owed it a fiduciary duty—that the Agreement represented a joint venture between the parties. (AC ¶¶ 59–60; Damron Opp. at 23–25.) Because the Court independently concludes that Damron owed Plaintiff fiduciary duties by virtue of his position as Director of Lubrication, it need not decide whether the Agreement created a joint venture at this stage.

employee" is a factual dispute that is premature at this stage. (Damron Reply at 13.) Plaintiff plainly alleges that Damron was a director, and that he exercised extensive control over Plaintiff's lubrication production, supply, and marketing. (AC ¶ 28; *id.* at 35–37.) To the extent that the Damron Defendants argue that the position "Director of Lubrication" is a misnomer, and that Damron was not *really* a director at all, a fuller record on this issue needs to be developed through discovery. The Damron Defendants offer no cases distinguishing Damron's role with Plaintiff from that of the typical LLC director as a matter of law. (Damron Reply at 13–14.) Even assuming, *arguendo*, that Damron was a director in name only, New Jersey law still confers a duty of loyalty on employees "occupying a position of trust and confidence," which Plaintiff adequately pleads relating to Damron. *Cameco, Inc. v. Gedicke*, 724 A.2d 783, 789 (N.J. 1999); (AC ¶¶ 28, 52–53; *id.* at 35–37); *see also Big M, Inc. v. Dryden Advisory Grp.*, No. 08-3567, 2009 WL 1905106, at *24 (D.N.J. June 30, 2009) (explaining that "[a] fiduciary obligation exists whenever one person places special 'trust and confidence' in another person upon whom the person relies to exercise discretion and expertise upon behalf of that person."). Because the Court is satisfied—and Defendant does not otherwise contest—that Plaintiff has sufficiently pleaded the remaining elements for a breach of fiduciary duty claim of breach and damages, the Damron Defendants' motion to dismiss is denied with respect to Count I.

### 2.   *Counts II, III, & IV: Contractual Claims*

Plaintiff next asserts three contractual claims against both of the Damron Defendants in connection with the Agreement and Damron's alleged conduct: breach of contract, (AC ¶¶ 62–72), breach of the implied covenant of good faith and fair dealing, (*id.* ¶¶ 73–75), and unjust enrichment, (*id.* ¶¶ 76–79). Plaintiff argues that it had a valid contract with the Damron Defendants in the Agreement, and that, by "failing to supply LFE; secretly transferring LFE to a competitor;

18

refusing to share profits from LFE-based products; and, ultimately, [Damron withdrawing] from his contractual obligations," the Damron Defendants breached that contract and caused "damages exceeding $914,000." (*Id.* ¶¶ 64–65.)

"To plead a breach of contract in New Jersey, a plaintiff must allege that (1) there was a contract, (2) that contract was breached, (3) the breach resulted in damages, and (4) the person suing for breach performed his own contractual duties." *Cotter v. Newark Housing Auth.*, 422 F. App'x 95, 98 (3d Cir. 2011). In their Motion, the Damron Defendants do not appear to contest that the Agreement constituted a valid contract,[15] or that Plaintiff performed its contractual obligations. (Damron MTD at 19–20.) Instead, the Damron Defendants argue that Plaintiff (1) only offers conclusory allegations about the nature of the breach, failing "to link Defendants' conduct with the pertinent contract provisions," (2) incorrectly asserts that Plaintiff "established ownership of HDI-2500," and that Plaintiff may not "pursue a breach of contract claim on Defendants' purported interference with rights it does not possess," and (3) fails to allege "any causal connection between Defendants' purported breach and [Plaintiff's] alleged damages." (*Id.* at 20.)

Plaintiff clearly alleges multiple material breaches of the Agreement. The Agreement grants Plaintiff "the exclusive right to market and sell HDI-2500 and any derivative of, or ancillary products of HDI-2500 for an initial term of 10 years." (AC at 35.) Even if the Damron Defendants retained ultimate ownership of the HDI-2500 formula, (*id.* ("The HDI-2500 formula is owned and will continue to be owned by Harold Damron / HDI.")), according to the allegations in the AC, they rather directly breached this contractual term and undermined Plaintiff's delegated rights

---

[15] Even assuming, *arguendo*, that the Damron Defendants did challenge that the Agreement was a contract, the Court is satisfied that Plaintiff has met its burden at this stage. "The essentials of a valid contract are: mutual assent, consideration, legality of object, capacity of the parties and formality of memorialization." *Cohn v. Fisher*, 287 A.2d 222, 291 (N.J. Super. Ct. Law Div. 1972). Plaintiff's AC pleads each of these elements, with the signed Agreement containing each of the contract's essential terms. (AC ¶¶ 26–40; *id.* at 35–37.)

19

when they provided HDI-2500 to Duravi, Inc., (*id.* ¶¶ 41–57.) Further, the Agreement required that any "decision to sell [the HDI-2500 formula] must be unanimous between Harold [Damron] and Randall [Taylor] and the proceeds shall be split 50/50 between Harold Damron and Industrial Sustainability Group (ISG)." (*Id.* at 37.) Damron's unilateral transfer of the LFE formula to Duravi, Inc. for $750,000, profit he did not share with ISG (Plaintiff's parent company), breaches this provision. (*Id.* ¶¶ 42–45; *id.* at 35 ("FUEL OX, LLC, (FO) a division of Industrial Sustainability Group (ISG)").) Because the Court is satisfied that Plaintiff has met its pleading burden at this stage, it need not delve into the other material breaches alleged in the AC, including, *inter alia*, Damron's failure to provide LFE to Plaintiff at $3,500 a drum. (*Id.* ¶¶ 26–28, 39–53.)

The Court is also satisfied that Plaintiff has sufficiently pleaded damages stemming from these breaches at this stage, in particular, any resultant damages it suffered in connection with Damron's failure to honor Plaintiff's exclusive rights. (*Id.* at 35); *Vibra-Tech Eng'rs, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 497 (D.N.J. 2012) ("In the context of a breach of contract action in New Jersey, it has long been established that a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract, including lost profits to the extent such profits can be established with a reasonable degree of certainty." (quotation marks omitted)). Accordingly, Defendants' Motion is denied with respect to Count II.

Similarly, Plaintiff has sufficiently pleaded its breach of the implied covenant of good faith and fair dealing claim. As a general matter, "[a] breach of the covenant of good faith and fair dealing [cannot] arise out of the same conduct underlying an alleged breach of contract action," *Irene v. Michael Whaley Interiors, Inc.*, No. 19-14998, 2020 WL 759573, at *2 (D.N.J. Feb. 13, 2020) (alternation in original) (quotation marks omitted). However, a party may pursue such a claim independent of a breach of contract claim "in three limited circumstances: (1) to allow the

20

inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance." *Grace's Dream, LLC v. PB Holdco, LLC*, No. 24-5651, 2025 WL 396756, at *6 (D.N.J. Feb. 5, 2025) (quotation marks omitted). "Under New Jersey law, a claim for breach of the duty of good faith and fair dealing requires a showing of bad motive or intention, though at the pleading stage all that is required is an allegation of bad faith." *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308, at *11 (D.N.J. Mar. 31, 2010) (cleaned up).

Plaintiff sufficiently alleges that Damron performed his discretionary obligations as the Director of Lubrication in bad faith. In particular, Damron—from the Agreement's signing in April 2021 until his official joining of Duravi, Inc. in September 2024—shirked his obligations to "support the sales team at [Plaintiff] in the selling of all [Plaintiff's] products as best he can[, and] . . . attend functions, trade shows, symposiums, and the like." (AC at 36; *id.* ¶¶ 40, 46 (Damron attended only six or seven trade shows in more than three years before stopping performance and communication all together).) Damron's clandestine efforts to enter a private agreement with a competitor without Plaintiff's knowledge—while representing his continued loyalty—and while serving as Plaintiff's Director of Lubrication are sufficient to indicate Damron's bad faith at this stage. (*Id.* ¶¶ 41–45.) *See ABS Assocs., Ltd. v. Hartz Mountain Dev. Corp.*, 2006 WL 1519577, at *13 (N.J. Super. Ct. Ch. Div. May 9, 2006). Accordingly, the Damron Defendants' Motion is denied with respect to Count III.

However, the same cannot be said for Plaintiff's unjust enrichment claim. "[U]njust

enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability. And a quasi-contract claim cannot exist when there is an enforceable agreement between parties." *Grace's Dream, LLC*, 2025 WL 396756, at *8 (cleaned up). "Courts have consistently held that absent a claim that the contract is invalid, a plaintiff cannot maintain an unjust enrichment claim, even in the alternative." *Id.* (quotation marks omitted) (collecting cases). Here, neither party disputes the validity of the Agreement as an enforceable contract. To the extent that the Damron Defendants argue that the Agreement does not give Plaintiff a full ownership interest in HDI-2500, (*see* Damron Reply at 14), this is not an argument that the Agreement is "invalid, void, or otherwise unenforceable," *Grace's Dream, LLC*, 2025 WL 396756, at *8. Indeed, the Damron Defendants do not argue—in supporting their Motion to Dismiss Plaintiff's breach of contract claim—that the Agreement is unenforceable or void. (*See* Damron MTD at 19–20.) Accordingly, the Damron Defendants' Motion to Dismiss is granted with respect to Count IV, which is dismissed without prejudice. *See Grace's Dream, LLC*, 2025 WL 396756, at *12 (dismissing unjust enrichment claim without prejudice).

### 3.    Count V: Fraudulent Misrepresentation

Plaintiff also asserts that the Damron Defendants' conduct constituted fraudulent misrepresentation. (AC ¶¶ 80–85.) Plaintiff, without being specific as to the precise misrepresentations, alleges that the Damron Defendants "made false statements concerning the commitment to supply [Plaintiff] LFE, the ongoing partnership with Plaintiff, and the adherence to the [Agreement] throughout 2023 and 2024." (*Id.* ¶ 81.) Plaintiff further alleges that the Damron Defendants misrepresented their "continued cooperation" with Plaintiff even as they engaged in private negotiations with and transferred the LFE formula to Duravi, Inc.. (*Id.* ¶¶ 82–83.)

As a threshold matter, however, Plaintiff's claim for fraudulent misrepresentation is barred

22

by the economic loss doctrine.[16] "The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *Bracco Diagnostics Inc. v. Bergan Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (quotation marks omitted). "The critical issue in determining whether a tort claim can be asserted alongside a breach of contract claim is whether the allegedly tortious conduct is extraneous to the contract." *Valiant Consultants Inc. v. FBA Support LLC*, No. 21-12047, 2022 WL 2803104, at *5 (D.N.J. July 18, 2022) (quotation marks omitted). "While the state of New Jersey law in the application of the doctrine has been defined by the Third Circuit as a 'morass,' one divining principle that has been applied by courts in this district is whether the fraud is *extrinsic* to the underlying contract claim." *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. 07-321, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008) (emphasis added) (citing *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 144 (3d Cir. 2001)).

Although Plaintiff argues that its allegations regarding this claim are "extraneous" to the Agreement, each of the Damron Defendants' alleged misrepresentations is explicitly contemplated by different terms in the Agreement. (Damron Opp. at 34–35.) None of the alleged misstatements—relating to Damron's ability to supply LFE, continued adherence to the contract, and fidelity to Plaintiff—can reasonably be interpreted as "extrinsic to the underlying contract claim." (AC ¶¶ 81–83); *Capitalplus Equity, LLC*, 2008 WL 2783339, at *6. First, the Agreement contemplates the Damron Defendants' obligation to supply HDI-2500 concentrate at a price of $3,500 per drum for the duration of the 10-year term, subject to future agreed price changes. (*Id.* at 35.) Moreover, by virtue of the 10-year, contractually mandated terms, the Agreement clearly

---

[16] Because the Court otherwise dismisses this claim on economic loss doctrine grounds, it declines to address whether Plaintiff's allegations would survive the heightened pleading requirement of Rule 9(b).

addresses the Damron Defendants' "ongoing partnership with Plaintiff[] and adherence . . . throughout 2023 and 2024." (*Id.* ¶ 81; *see id.* at 35.) Finally, the Agreement contains explicit terms related to the Damron Defendants' obligations in dealing with other parties interested in purchasing LFE, like Duravi, Inc.: Damron was entitled to a 15% commission for gross sales he initiated with new customers, and future sales of the LFE formula must be agreed to by both Damron and Randall Taylor (with profits from those sales shared). (*Id.* at 36–37.) Plaintiff and the Damron Defendants even specified how Damron would be compensated for proceeds he received in connection with "other agreements involving the sale of HDI-2500" existing prior to the Agreement with other, non-Plaintiff parties. (*Id.* at 37.) Thus, if Damron's dealings with Duravi, Inc. were inconsistent with Damron's obligations under the Agreement, as is the case here, Plaintiff is entitled to enforce those obligations through a breach of contract claim, not tort. *See Bracco Diagnostics Inc.,* 226 F. Supp. 2d at 562. Accordingly, the Damron Defendants' Motion is granted with respect to Count V, which is dismissed without prejudice.

       *4.*      *Count VI & VII: DTSA & NJTSA Misappropriation of Trade Secrets Claims*

Plaintiff's next two claims against the Damron Defendants are for misappropriation of trade secrets—here, the "LFE formulation, certifications, and derivative product data"—under the DTSA and NJTSA. (AC ¶¶ 86–109.) Courts in this District analyze the merits of trade secret claims under the DTSA and NJTSA together. *See Sunbelt Rentals, Inc. v. Love*, No. 20-17611, 2021 WL 82370, at *23 (D.N.J. Jan. 11, 2021). To state a claim under both the DTSA and NJTSA, Plaintiff must "demonstrate (1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure

of the secret."[17] *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019) (citing 18 U.S.C. §§ 1836(b)(1), 1839(3), (5); N.J. Stat. Ann. § 56:15-2).

Proving "misappropriation" of a trade secret requires, in relevant part, "(A) acquisition of a trade secret of another person by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5); *see* N.J. Stat. Ann. § 56:15-2 (same). These "improper means" of acquisition, disclosure, or use include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but "do[] not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6); *see* N.J. Stat. Ann. § 56:15-2 (similar). In short, "DTSA and NJTSA claims require the existence of (1) information that derives independent economic value, that (2) the owner has taken reasonable measures to keep secret, and that (3) the defendant improperly acquired, disclosed, or used." *Sunbelt Rentals*, 2021 WL 82370, at *24.

Plaintiff has failed to sufficiently plead that it took "reasonable measures" to keep the purported trade secrets a secret.[18] Although "[h]eroic measures" are not required, plaintiffs bringing trade secret claims must undertake *some* reasonable steps "to protect the secrecy of the

---

[17] The DTSA defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . [that] the owner thereof has taken reasonable measures to keep . . . secret; and . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The NJTSA contains a similar definition. *See* N.J. Stat. Ann. § 56:16-2; *Sunbelt Rentals*, 2021 WL 82370, at *23–24.

[18] Because the Court dismisses Plaintiff's trade secret claims on these grounds, it declines to address the Damron Defendants' remaining arguments. (Damron MTD at 10–19.)

25

information" at issue. *Syncsort Inc. v. Innovative Routines, Int'l, Inc.*, No. 04-3623, 2011 WL 3651331, at *16 (D.N.J. Aug. 18, 2011) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 359 (D. Mass. 1993)). These reasonable steps often include some form of confidentiality agreement to not "disclose, use, or divulge" confidential information. *See Sunbelt Rentals*, 2021 WL 82370, at *24; *Par Pharm.*, 764 F. App'x at 278 (concluding that plaintiff "took reasonable steps to protect the secrecy of its plan through the use of non-disclosure agreements and appropriate facility security measures."); *NJ Coed Sports LLC v. ISP Sports, LLC*, No. 22-6969, 2023 WL 3993772, at *4 (D.N.J. June 14, 2023) ("Non-disclosure or confidentiality agreements are often considered 'reasonable measures' of keeping information secret under the DTSA." (collecting cases)).

Here, Plaintiff offers no information whatsoever, let alone details, about any steps it took to keep the LFE formulation and associated certifications and data secret. Instead, in asserting its trade secrets claims, Plaintiff merely alleges that "[r]easonable steps were taken by Plaintiff to keep LFE formulation, certifications, and derivative product data confidential." (AC ¶¶ 88, 100.) Such a conclusory assertion is insufficient to satisfy this required element. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)). Nowhere in Plaintiff's AC does Plaintiff indicate that it took any of the confidentiality, non-disclosure, or other security measures to ensure that the Damron Defendants did not misappropriate LFE, and the Agreement itself contains no such secret-protecting language. (*See generally* AC.) Accordingly, the Damron Defendants' Motion is granted with respect to Counts VI and VII, which are dismissed without prejudice.

### 5.    Count XIV: Civil Conspiracy

Plaintiff's final claim against the Damron Defendants is for civil conspiracy for its alleged collusive efforts with Duravi, Inc. (*Id.* ¶¶ 166–76.) To state a claim for civil conspiracy in New Jersey, a plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (quoting *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)). Crucially, "[t]he gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" *Morgan*, 633 A.2d at 998 (quoting *Bd. of Educ. v. Hoek*, 183 A.2d 633, 646 (N.J. 1962)); *see also Hoek*, 183 A.2d at 646 ("Proof of a conspiracy makes the conspirators jointly liable for the wrong and resulting damages."). As such, "[c]ivil conspiracy claims under New Jersey law require the plaintiff to plead a viable underlying tort claim." *Dill v. Yellin*, 725 F. Supp. 3d 471, 484 (D.N.J. 2024).

Because the only remaining viable tort claim against the Damron Defendants is the breach of fiduciary duty claim against Damron himself, the civil conspiracy claim must be dismissed. Under New Jersey law, courts consistently emphasize that the "underlying wrong . . . , absent the conspiracy, would give a right of action," against conspirators, *Morgan*, 633 A.2d at 998 (quotation marks omitted), and that those conspirators would be "jointly liable for the wrong," *Hoek*, 183 A.2d at 646, suggests that each of the co-conspirators must independently be capable of committing the underlying tort, and must therefore possess fiduciary duties to breach. Although New Jersey courts have not conclusively applied this rule to breach of fiduciary duty cases, other states have determined that in order to plead a conspiracy to breach fiduciary duties, each of the

27

co-conspirators must owe "independent fiduciary dut[ies]" to the plaintiff.[19] *See Off. Comm. Of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00-8688, 2002 WL 362794, at *14 (S.D.N.Y. Mar. 6, 2002) (collecting cases); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999) (determining after review of civil conspiracy law that "one cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant" and that "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor" (quotation marks omitted)).

In short, Damron cannot exist in a conspiracy of one. As Plaintiff alleges that only Damron himself—and not HDI nor Duravi, Inc.—possessed fiduciary duties to Plaintiff, Defendants collectively could not have conspired to breach Damron's fiduciary duties. (AC ¶¶ 58–61 (alleging only that "Damron owed Plaintiff the fiduciary duties of loyalty, care, and good faith, among others").) Damron cannot be the sole member of a conspiracy in which he exclusively would be liable of the underlying tort. *Cf G.D. v. Kenny*, 15 A.3d 300, 321 (N.J. 2011) (requiring defendants in a civil conspiracy to have "committed an unlawful act or a wrong against [plaintiff] *that constitutes a tort* entitling [plaintiff] to a recovery" (emphasis added)). Accordingly, the Damron Defendants' Motion is granted with respect to Count XIV, which is dismissed without prejudice.

---

[19] Lacking clear New Jersey law on this point, the Court "must 'predict how the New Jersey Supreme Court would rule if presented with this case.'" *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 119 (3d Cir. 2010) (quoting *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 489 (3d Cir. 1991)). In making this prediction, the Court "must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue, as well as to analogous decisions, [and] considered *dicta*," *Lupu v. Loan City, LLC*, 903 F.3d 382, 389 (3d Cir. 2018) (quoting *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011)). Ample New Jersey precedent supports the Court's conclusion that a defendant in a civil conspiracy must be able to be held jointly liable for the wrong. *See, e.g., Hoek*, 183 A.2d at 646. However, assuming, *arguendo*, this is only a prediction, the other authorities cited above support the inference that the New Jersey Supreme Court would conclude the same. *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d at 789.

## CONCLUSION

For the foregoing reasons, the Duravi, Inc. Motion to Dismiss under Rule 12(b)(2) is **GRANTED** and Counts VIII through XIV against Duravi, Inc. are **DISMISSED WITHOUT PREJUDICE**. The Damron Defendants' Motion to Dismiss under Rule 12(b)(6) is **GRANTED IN PART** and **DENIED IN PART**. Counts IV, V, VI, VII, and XIV against the Damron Defendants are **DISMISSED WITHOUT PREJUDICE**. The Damron Defendants' Motion is **DENIED** with respect to Counts I, II, and III. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: May 11, 2026

29